**Paul HAMMONTREE, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 89–1137.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 31, 1989.

Decided Jan. 23, 1990.

Rehearing En Banc Granted March 30, 1990.

---

Paul Alan Levy with whom Alan B. Morrison and Arthur L. Fox II, Washington, D.C., were on the brief, for petitioner.

Paul J. Spielberg, Deputy Asst. Gen. Counsel, NLRB, with whom Joseph E. Desio, Acting Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, and Aileen A. Armstrong, Deputy Associate Gen. Counsel, NLRB, Washington, D.C., were on the brief, for respondent.

David P. Jaqua, New Orleans, La., for intervenor, Consolidated Freightways Corp. of Del.

Before WALD, Chief Judge, MIKVA, Circuit Judge, and GESELL,* District Judge.

MIKVA, Circuit Judge:

The National Labor Relations Board ("NLRB" or "the Board") insists that it may require an individual employee who files an unfair labor practice ("ULP") complaint against his employer to present his grievance to an arbitration committee pursuant to his union's collective bargaining agreement with his employer. We find that Congress did not contemplate such a deferral of individual ULP claims to arbitration; only when the resolution of the petitioner's claim under the National Labor Relations Act ("NLRA" or "the Act") requires interpretation or application of the language of the collective-bargaining agreement is such deferral warranted. Because none of the concerns is over contractual obligations that would justify the Board's deferral-to-arbitration policy are present here, we reverse the decision of the Board to defer, and we remand the case to be decided on the merits.

## I. BACKGROUND

The petitioner, Paul Hammontree, is employed as a truck driver for Consolidated Freightways Corporation of Delaware ("the Employer") at its terminal in Memphis, Tennessee. He works as a "peddle driver" which means that he makes relatively short, round-trip deliveries. Under the collective-bargaining agreement that the Employer negotiated with Hammontree's representatives, the Teamsters Union, the Employer must post all "runs" or regular driving duties in order to allow those employees with the most seniority to obtain the most desirable runs. Since peddle drivers are paid by the mile, this meant that senior drivers had priority to choose the more lucrative, longer runs.

In 1982, the Teamsters Local Union 667 reached an oral agreement with the Employer that the Employer would post the departure times of peddle runs so that drivers would not have to wait by the telephone in order to be informed of their departure time. In exchange for the convenience of not having to "babysit the telephone," the drivers were no longer allowed to exercise seniority in selecting peddle runs. As one of the most senior drivers, Hammontree complained to the Employer's operations manager, Len Breeden, that certain dispatchers were not giving senior drivers their choice of runs as was required by the collective-bargaining agreement. Breeden, however, reminded Hammontree that the union and the Employer had agreed that the Employer would post departure times for peddle runs in exchange for a waiver of the seniority privilege and that if Hammontree filed a grievance over seniority privileges pursuant to the collective-bargaining agreement, then Hammontree would be forced to sit by the telephone to await departure times. Despite Breeden's warning, Hammontree filed a grievance in December 1985, alleging that the Employer had violated the seniority privileges that were recognized under the collective-bargaining agreement. Hammontree's grievance was not resolved at the local level and proceeded to the Multi–State Joint Committee—consisting of an equal number of representatives from both the union and the company—which also deadlocked. Finally,

* The Honorable Gerhard A. Gesell, of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

**440**

in June 1986, after proceeding to the next level of arbitration, the Southern Area Grievance Committee ruled in favor of Hammontree and awarded him $62 because his seniority rights to priority peddle runs had been violated.

Shortly thereafter, Breeden informed Hammontree that he would regret his victory because, by filing his seniority grievance, Hammontree had breached the oral agreement and therefore the Employer would no longer post departure times for peddle runs. Accordingly, on July 15, 1986, for the first time in four years, the company posted peddle runs without departure times. Later that month, Hammontree and another senior driver, Osborne, filed a second grievance alleging that the refusal to post departure times violated the collective-bargaining agreement. This second grievance, which Hammontree discussed with Union representative Jimmy Carrington, did *not* allege that Hammontree had been discriminated against because of his union activities. Rather, it only alleged that the posting of departure times had become part of company practice and thus was included within the minimum standards clause of the collective-bargaining agreement. The Multi–State Joint Committee dismissed Hammontree's second grievance without explanation.

Thereafter, Hammontree was assigned to several undesirable runs, including trips to closed terminals in the middle of the night. He subsequently filed an unfair labor practices charge with the NLRB alleging that he had been retaliated against for exercising his union rights. The NLRB's general counsel issued a complaint on Hammontree's behalf alleging that the Employer had violated § 8(a)(1) and (3) of the Act by retaliating against Hammontree for filing grievances. After a hearing, an Administrative Law Judge ("ALJ") agreed with the general counsel and held that the Employer had violated § 8(a)(1) and (3) of the NLRB. The ALJ concluded that while the Employer may have had a contractual right to discontinue posting departure times, it was forbidden to exercise this right for the purpose of retaliating against Hammontree for his filing of a grievance.

The ALJ also found that the Employer had on one occasion wrongfully assigned Hammontree to an undesirable run, but that there were adequate explanations for the other irregular runs.

Upon review, the Board did not reach the merits of this case but held instead that this grievance should have first been presented to a joint labor-management arbitration committee pursuant to the collective-bargaining agreement. Because the unfair labor practices charge could also have been brought before the arbitration committee under the antidiscrimination provisions of the collective-bargaining agreement, the NLRB dismissed Hammontree's complaint and referred the case back to the arbitration committee. The NLRB noted that it would retain limited jurisdiction over the case, pending the arbitration committee's decision, in order to consider claims that the arbitration committee did not properly address the issues.

## II. Discussion

This case raises again the interaction of two congressional policies: the prevention of unfair labor practices and the fostering of the collective-bargaining process. There can be no dispute that the NLRB gives the Board exclusive power to prevent unfair labor practices. Section 10(a) of the Act, 29 U.S.C. § 160, provides in pertinent part:

The Board is empowered to prevent ... any person from engaging in any unfair labor practice (listed in Section 8) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise....

Any interference with the right to engage in union-related activity constitutes an unfair labor practice. Section 7 of the NLRB, 29 U.S.C. § 157, provides in pertinent part:

Employees shall have the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concert-

ed activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities....

Section 8 of the Act, 29 U.S.C. § 158, further provides:

It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in Section 7;

\* \* \* \* \* \*

(3) by discrimination in regard to hire or tenure of employment or any terms or condition of employment to encourage or discourage membership in any labor organization....

While charging the Board with preventing unfair labor practices, Congress has also indicated its preference for allowing parties to a collective-bargaining agreement to resolve any disputes over the agreement in a manner by which they have agreed. Accordingly, Section 203(d) of the Labor–Management Relations Act, 29 U.S.C. § 173(d), provides in pertinent part:

Final adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective bargaining agreement.

The potential for tension between these two policies has led to numerous challenges to the Board's administration of the Act.

In evaluating the Board's construction of these provisions, this Court is guided by the principles articulated in *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Under *Chevron,* the Court must first consider the plain meaning of the Act. Where, as here, that meaning is clear, the Court can give no deference to the Board's contrary conclusions.

We find that in deferring Hammontree's ULP claims, the Board gave inadequate consideration to Congress' expressed intent in Section 10(a) that the Board's "power shall not be affected by any other means of

adjustment or prevention that has been or may be established by agreement, law, or otherwise...." *Chevron* makes clear that "the judiciary ... must reject administrative constructions which are contrary to clear congressional intent." 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9.

A. *NLRB authority to defer unfair labor practice complaints to arbitration*

The Board maintains that it is within its discretion to send Hammontree's case to arbitration. Although it concedes that Section 10(a) applies, it contends that this provision is ambiguous in light of the Congress' concurrent instructions to promote settlement by procedures adopted in collective-bargaining agreements. In light of these "competing" objectives, the Board maintains that deferral to arbitration is a reasonable means of accommodating Congress' goals. Because the collective-bargaining agreement between the Teamsters and the Employer contains two provisions forbidding unlawful company discrimination against employees for exercising union rights, the Board argues that deferring Hammontree's ULP claim to arbitration was proper.

The Board's claim that its duties are ambiguous is unsupported. Unlike the cases cited by the Board, this case does not require an accommodation between resolving ULP claims and enforcement of the collective-bargaining agreement. In those other cases, the employee's conduct or the nature of the dispute implicated the collective-bargaining provisions of the Act. Thus, this court has allowed the NLRB to defer ULP claims that require contractual interpretation to arbitration, *Associated Press v. NLRB,* 492 F.2d 662 (D.C.Cir. 1974); *Local Union No. 2188, IBEW v. NLRB,* 494 F.2d 1087 (D.C.Cir.), *cert. denied,* 419 U.S. 835, 95 S.Ct. 61, 42 L.Ed.2d 61 (1974). Likewise, other circuits have permitted the Board to defer where the employee has requested arbitration on the very issue before it, and the employee has not withdrawn that request. *Lewis v. NLRB,* 800 F.2d 818 (8th Cir.1986). Here, the employee has not requested arbitration

and no portion of his ULP claim rests upon a contractual matter that could be resolved in arbitration. The Board cannot implicate the Section 203(d) provisions that encourage adjustment through procedures contained in collective-bargaining agreements by its *own* preference for arbitration. We have never allowed the Board to defer *individual non-contractual* unfair labor practice claims to arbitration instead of addressing them itself. We decline to do so today.

The lead case establishing the Board's pre-arbitration deferral doctrine is *Collyer Insulated Wire*, 192 NLRB 837 (1971). In *Collyer*, the NLRB held that if the legal question of whether a party has committed an unfair labor practice also determines whether that party has violated the collective bargaining agreement, then it would send the case to arbitration and defer to the arbitrator's decision. The Board noted that allowing a party to take such a claim to the NLRB would violate that party's commitment to arbitrate contractual disputes. 192 NLRB at 842.

In *Associated Press v. NLRB*, 492 F.2d 662 (D.C.Cir.1974), and *Local Union No. 2188, IBEW v. NLRB*, 494 F.2d 1087 (D.C. Cir.), *cert. denied*, 419 U.S. 835, 95 S.Ct. 61, 42 L.Ed.2d 61 (1974), we expressly approved an application of the *Collyer pre-arbitration* deferral rule. However, in both of those cases, resolution of the ULP claims required interpretation of the collective-bargaining agreement. In *Associated Press*, the company maintained that the union's demands for dues collected pursuant to authorized "checkoffs" constituted an unfair labor practice. The Board deferred the company's ULP claim to arbitration because it found that the claim hinged on contractual issues. 492 F.2d 666. Accordingly, this court upheld the Board's pre-arbitration deferral policies.

Likewise, in *Local No. 2188, IBEW*, this court approved the Board's pre-deferral policy where the union filed ULP claims after company restructuring unilaterally changed the promotion status of certain employees. This court noted that the ULP charge was essentially a contractual dispute, and that the NLRB's pre-arbitration deferral was a proper reconciliation of its dual duties to promote collective-bargaining processes and to prevent unfair labor practices. 494 F.2d at 1090–91. However, we warned that if the *"congruence between the contractual dispute and the overlying unfair labor charge . . .* were not present, the Board's abstention might have constituted not deference, but abdication." 494 F.2d at 1091 (emphasis added). We think the Board's refusal to resolve Hammontree's grievance against the Employer constitutes such abdication and cannot be squared with the Board's obligation under the Act.

The ULP issue in *Collyer* was whether the company violated § 8(a)(5) of the NLRA by unilaterally altering the terms and conditions of employment by changing pay rates for certain job classifications. In adopting its pre-arbitration deferral doctrine, the Board recognized that adjudicating the § 8(a)(5) ULP claims essentially required an interpretation and application of the terms of the collective-bargaining agreement, which was the domain of the arbitrator.

Subsequently, the Board applied that same doctrine in *United Technologies Corp.*, 268 NLRB 557 (1984), even though the ULP charge filed by the union was for unlawful coercion under § 8(a)(1) of the NLRA and did not necessarily implicate any construction of the collective-bargaining agreement. We think the reasoning of *United Technologies* extended *Collyer* to a point that Congress prohibited. Deferral of ULP claims that do *not* involve the interpretation or application of provisions of the collective-bargaining agreement cannot be squared with the Board's mandatory obligation to remedy unfair labor practices.

The Eighth Circuit's ruling in *Lewis v. NLRB*, 800 F.2d 818 (1986)—the only other circuit case to consider the *United Technologies* doctrine—is not inconsistent with our holding. In that case, the union had, with the employee's knowledge and consent, commenced the arbitration-grievance process prior to any ULP claim, and that demand for arbitration still had not been

withdrawn at the time of the court's decision. Under those circumstances, the court held that deferral was reasonable since "all parties have agreed to be bound" by the arbitration. *Id.* at 821. The Eighth Circuit, then, merely recognized that an *employee* may choose to raise an unfair labor practice claim in arbitration before proceeding to the Board, and may be bound by that choice. Our holding supports this view. We decide only that the choice belongs to the employee and not to his union or the Board.

The difference between the case *sub judice* and those cases cited by the dissent is critical. The dissent asks why a bargain should be abrogated simply because the same guarantee appears in the Act. *Infra* at 448. But here the contract does *not* create the same guarantee between the same parties. The employee did not agree to arbitration of his ULP claims. Instead the Union created an additional procedure whereby it could arbitrate parallel claims. Only where the employee acts to subsume his ULP claims or his ULP claims rest upon otherwise arbitrable matters, may the Board defer. Here, Mr. Hammontree's ULP claims were not part of his bargain with the Employer. Absent a waiver by him of his ULP rights or an express statement by him that those rights were subsumed in the parallel contractual protections, the employee's ULP claims simply are not implicated in this contract.

### B. *The effect of the inclusion of non-discrimination language in the collective-bargaining agreement*

The Board maintains that because Article 21 of the collective bargaining agreement prohibits discrimination against employees for union activities and Article 37 of the agreement prohibits any unlawful discrimination, Hammontree's ULP claims are parallel to his contractual claims and therefore can be properly submitted to arbitration. This argument is misguided. The fact that Hammontree's union claims to have bolstered his protection by inserting parallel protection in its contract with the company does not deprive Hammontree of his preexisting statutory right to have his individual ULP claim brought before the Board. An individual's right to engage in union activities is codified in §§ 8(a)(1) and (3) of the NLRA. This right exists independently of any contract and cannot be diminished or diffused by its inclusion in a collective-bargaining agreement.

On at least three separate occasions the Supreme Court has held that the statutory rights of individual employees to present their grievance before a public forum could not be denied by the existence of a private dispute-resolution mechanism. In *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Court held that a dismissed employee has a right to file a title VII action in federal court despite the finding of an arbitrator that he was dismissed for cause. The Court found that the independent statutory guarantees of title VII could not be subsumed by the collective-bargaining process, and that an employee should have an opportunity to present his discrimination case in both public and private forums. 415 U.S. at 59–60, 94 S.Ct. at 1025.

In two other cases in which individual statutory rights were submitted in arbitration, the Supreme Court concluded that deferral to arbitration was an improper violation of congressional policy. In *Barrentine v. Arkansas–Best Freight System Inc.*, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), the petitioners' union filed a claim, pursuant to the collective-bargaining agreement, that the company was not properly compensating its employees. After losing before the arbitration committee, the petitioners filed suit in district court alleging that the company had violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* The Supreme Court, in rejecting the district court's deferral to the arbitration committee's decision, held that despite the existence of the collective-bargaining/arbitration mechanism, the petitioners had a statutory right to have their individual FLSA claims decided in federal court. "While courts should defer to an arbitral decision where the employee's claim is one that is based on rights arising out of a collective bargaining agree-

ment, different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers." 450 U.S. at 735, 101 S.Ct. at 1442. Similarly, a unanimous Supreme Court rejected the deferral-to-arbitration doctrine and upheld an individual's right to sue his employer in federal court for violation of 42 U.S.C. § 1983 for allegedly being discharged for exercising his first amendment rights. *McDonald v. City of West Branch*, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984).

As the Court in *Barrentine* noted, the interests of individual employees may differ from those of the union as a whole. Perhaps the union might legitimately sacrifice the individual claims of certain employees for what it believes is the greater good of the work force. 450 U.S. at 742, 101 S.Ct. at 1446. *See also Vaca v. Sipes*, 386 U.S. 171, 190–91, 87 S.Ct. 903, 17 L.Ed.2d 842. Moreover, an arbitration proceeding differs from a hearing before an ALJ or the NLRB. Whereas an arbitrator is concerned with interpreting the intent of the parties, the Board is charged with giving effect to the statutes that it enforces. *See Alexander*, 415 U.S. at 56–58, 94 S.Ct. at 1023–24. Additionally, the joint labor-management arbitration committees at issue here, which do not issue written explanations for their decisions, may choose to address a particular individual's grievance through a generalized give-and-take of union-employee interests, instead of by applying the terms of the statute. The distinctions are very pertinent in this case. Hammontree is clearly at odds with his union's leadership; to restrict him to a drumhead proceeding where his antagonists are viewed as his protectors is destructive to the labor policy enunciated in the Act.

Although neither *Alexander*, nor *Barrentine*, nor *McDonald* arose under the NLRA, they control the instant controversy. The *Alexander* Court noted that Congress also contemplated complementary public and private forums for resolving unfair labor practices under the NLRA: "Where the statutory right underlying a particular claim may not be abridged by contractual agreement, the Court has recognized that consideration of the claim by the arbitrator as a contractual dispute under the collective-bargaining agreement does not preclude subsequent consideration by the NLRB as an unfair labor practice charge." 415 U.S. at 50, 94 S.Ct. at 1020. The right to a guaranteed minimum wage which was at issue in *Barrentine* resembles the Section 7 right to engage in union activity because both are rights which apply to individual employees and exist independently of those rights which were won through the collective-bargaining process. Therefore, in light of Supreme Court precedent, we hold that the NLRB cannot defer its ruling on an unfair labor practice claim such as Hammontree's which exists independently of any contractual rights.

## C. *Legislative History of the NLRA*

The absence of any generalized preference for arbitration in the NLRA which would trump an employee's Section 10(a) rights is confirmed by the legislative history of the Act and its subsequent amendments. During the Wagner Act debates, Congress considered but failed to pass several bills containing the general deferral authority that the Board now claims. The original version of the 1935 bill that Senator Wagner introduced contained the following language: "The Board may, in its discretion, defer its exercise over any such unfair labor practice in any case where there is another means of prevention provided for by agreement, code, or otherwise, which has not been utilized." S.1958, original Senate print, 74th Cong., 1st Sess. § 10(b), (1935); *reprinted in* 1 NLRB, LEGISLATIVE HISTORY OF THE NATIONAL LABOR RELATIONS ACT, at 1301 (1949) (hereinafter "*LHNLRA*"). The original Wagner bill also contained an arbitration section which provided that the Board could arbitrate labor disputes or appoint "any person, agent or agency to act as arbitrator." *Id.* § 12; *reprinted in* 1 *LHNLRA* at 1305–07. This plan had been vigorously opposed by various labor groups and spokesmen. *See Hearings on S.1958 Before the Senate Comm. on Education and Labor*, 74th

Cong., 1st Sess. 715–16 (1935) (statement of William H. Davis of the Twentieth Century Fund, Inc.), *reprinted in LHNLRA* at 2102–03; *id.* at 745–46 (1935) (brief of Railroad Workers and Shopcrafters) *reprinted in LHNLRA* at 2131–32; *Id.* at 811–15 (1935) (speech of Louis Weinstock, National Secretary of American Federation of Labor's Committee For Unemployment Insurance and Relief), *reprinted in LHNLRA* at 2197–2201; *see also Hearing on S. 2926 Before the Senate Comm. on Education and Labor,* 73d Cong., 2d Sess. 485–89 (1934) (statement of George H. Powers on behalf of Steelworkers of Bethlehem Steel Corp.), *reprinted in LHNLRA* at 519–23.

After this strong opposition was voiced, the Senate Committee deleted the deferral and arbitration language from the version of the bill that subsequently became the NLRA. *See* S.1958, 2d Senate print, *reprinted in LHNLRA* at 2291, 2295–97; 79 CONG. REC. 7651–52, *reprinted in LHNLRA* at 2351, 2354–55. Contrary to the dissent's assertion (*infra* at 448, n. 2), the legislative history amply explains why the deferral provisions were dropped from the final bill. During the hearings on the original Wagner Act, E.P. Cush, National President of the Steel and Metal Workers Industrial Union, summarized the employees' concern that deferral would permit collusion by companies and unions to deprive the workers of their fundamental protections against unfair practices. "[Union] bureaucrats are always ready to submit to arbitration. . . . When the employers feel it suits their interests to do so, they will submit to arbitration, and invariably when the decisions are handed down by the boards, the workers are betrayed." *Hearings on S.1958 Before the Senate Comm. on Education and Labor,* 74th Cong., 1st Sess. at 489, 492 (1935), *reprinted in LHNLRA* at 523, 526. The various versions of the bills pending before the House of Representatives also indicate that the sections providing for deferral and arbitration were considered and later deleted. (Compare H.R. 6288, 74th Cong., 1st Sess., *reprinted in LHNLRA* at 2464, 2468–70 with H.R. 7978, 74th Cong., 1st Sess., *reprinted in LHNLRA* at 2863, 2867.)

Throughout the history and amendments of the Wagner Act, Congress has consistently expressed its desire to protect the individual worker from being discriminated against by his employer or his union. This is evidenced by the extensive congressional debates concerning the perils of the so-called "company dominated union" which does not protect the rights of the workers but is in essence a pawn of management. *See* 79 CONG. REC. 7570 (1935) (remarks of Sen. Wagner), *reprinted in LHNLRA* at 2333–34. While the majority rule provision of the Wagner Act was designed to ensure that the union with the greatest employee support was to be the exclusive bargaining representative for the employees, Congress maintained that the non-discrimination provisions of the Wagner Act were designed to protect the rights of individual and minority employees—even without their union's help. S. REP. NO. 573, 74th Cong., 2d Sess. 13, *reprinted in LHNLRA* at 2312–13. As Senator Wagner stated during floor debates, "the prohibition of certain unfair labor practices . . . [is] intended to make the worker a free man." 79 CONG. REC. 7574, *reprinted in LHNLRA* at 2343.

Perhaps nowhere is congressional concern for the well-being of the individual employee vis-a-vis the powerful union more manifest than in the 1959 Labor–Management Reporting and Disclosure Act ("the LMRDA" or "the Landrum–Griffin Act"). The LMRDA was passed at a time when union corruption was widespread and individual employees were powerless to prevent abusive union tactics. In response, title 1 of the 1959 Act provides for a bill of rights for union members guaranteeing equal rights for all employees, including freedom of speech and the right to sue. 29 U.S.C. § 411.

In addition to codifying the rights of union members and regulating the internal affairs of unions in order to stamp out racketeering and corruption, the Landrum–Griffin Act also added § 10(m) to the NLRA providing that the Board should give discriminatory ULP claims under § 8(a)(3) priority over all other cases except secondary boycotts. According to Senator

Mundt who introduced this amendment, § 10(m) was intended to redress the problem of the individual employee who loses his job or wages as a result of discriminatory behavior. He noted that the Board often delays hearing such cases for years. By introducing this measure, Senator Mundt sought to extend to the individual the same priority treatment that the Board showed to companies faced with secondary boycotts. 105 CONG. REC. 6044 (1959) (remarks of Sen. Mundt), *reprinted in* 1 NLRB, LEGISLATIVE HISTORY OF THE LABOR MANAGEMENT REPORTING AND DISCLOSURE ACT OF 1959, at 1253 (1959) (hereinafter "LHLMRDA"). *See also* H. REP. No. 741, 86th Cong., 1st Sess. 27, *reprinted in LHLMRDA* at 785. The Board's current policy of uniformly deferring individual discrimination cases to arbitration squarely conflicts with this congressional command that such cases be given priority treatment by the NLRB.

From the legislative history of the Landrum–Griffin Act, it is clear that Congress believed that, because of widespread corruption, not all unions could be trusted to safeguard the interests of all of their employees. Speaking in support of the LMRDA, Congressman Bosch noted that most NLRB cases of discrimination against employees are filed by individuals, not unions. Many of such cases involved "so-called sweetheart deals between union leaders and employers ... in which workers are denied their rights." 105 CONG. REC. 1430 (1959), *reprinted in LHLMRDA* at 1616. As Congressman Bosch recognized, without government protection, an individual employee is powerless against his employer and his union bosses. In light of this recurring congressional concern for the protection of the individual employee, the Board's current policy of deferring individual ULP claims to arbitration committees interdicts its responsibility to protect the rights of individual employees.

D. *The effect of the Board retaining limited jurisdiction over Hammontree's ULP Claims*

The Board argues that by deferring Hammontree's claim to the arbitration com-mittee, it has merely attempted to give the contractual grievance system an opportunity to address his ULP claim. Because Hammontree can appeal the results of the arbitration committee's decision of the Board under its post-deferral standards, the Board contends that his statutory rights have not diminished. However, the Board fails to consider the fact that a challenger to an arbitration decision bears the burden of showing that the arbitrator's decision was repugnant to the act or that the ULP issues were not fairly decided. *Olin Corp.*, 268 NLRB 573 (1984).

An individual's right to have the NLRB review an arbitrator's decision under the *Olin* standard, which gives broad deference to the arbitrator, is completely different from the right to bring a ULP claim before the Board *de novo.* This is especially true when the arbitration is before a Teamster Joint Arbitration Committee. Under the Teamster method, a panel consisting of an equal number of representatives from the union and the Employer, instead of a neutral third party, hears the employee's grievance. After hearing the individual's claim, the joint committee meets in private and issues either a flat denial or a grant of the grievance without offering any explanation for its decision. There is no way of knowing whether the individual's claim was fairly decided, let alone the grounds for such decision. Such a scenario is particularly troubling if the individual employee is at odds with his union leadership, as would appear to be this case. *See* Zimmerman, *The Teamster Joint Grievance Committee and the NLRB Deferral Policy: A Failure to Protect the Individual Employee's Statutory Rights*, 133 U.PA.L.REV. 1453 (1985). As Zimmerman notes, "the Teamster system does not adequately protect the individual from management or union discrimination. In effect, it mandates negotiation over whether the statute has been violated and places the alleged violators in the position of deciding the outcome of the grievance." *Id.* at 1457. As there is no way to ensure that the employee will be adequately represented or that the arbitrator will properly inter-

pret the governing statute, deferring an individual discrimination case to arbitration denies the employee the legal protection that he would receive if his case were heard by the Board *de novo*. *See also* Note, *The NLRB and Deference to Arbitration*, 77 YALE L.J. 1191, 1204–08 (1968).

Moreover, this retention of jurisdiction does not meet the requirements of diligence imposed on the Board by LRMDA. There was no recognition anywhere in the Board's proceeding that Congress considered this type of ULP an urgent matter for the employee involved and had directed the Board to give such cases priority.

The Board expresses its concern that if individual employees are allowed to proceed directly to the NLRB with their grievances, then unions could avoid their obligation to arbitrate by disguising union grievances as individual ULP claims. We find no evidence of such practices, but in any event, our ruling today would not allow such a result. Because we only require that individuals *whose ULP claims do not require contractual interpretation* be given an opportunity to present such claims to the Board, unions will not be able to circumvent their obligation to arbitrate disputes arising under collective-bargaining agreements. Moreover, our ruling does not prevent an individual from voluntarily choosing to arbitrate his grievance.

Any fears that our decision today will cause the Board to be flooded with individual ULP cases are equally unfounded. Prior to the adoption of *United Technologies*, there was no evidence that the private grievance and arbitration systems were being undermined because individual claims were not deferred to arbitration. *See United Technologies*, 268 NLRB at 562 (Member Zimmerman, dissenting). Instead, by giving the individual employee the choice between taking his case to the union or the Board, our decision may encourage unions to do a better job of protecting the rights of their members and thereby properly discourage the need for employees to bring such claims before the NLRB.

Deferral to arbitration is perfectly legitimate when the issues submitted to the arbitrator require contractual interpretation. However, when an unfair labor practice against an employee is involved, the Board, by deferring to arbitration, is asking a potentially hostile or indifferent agent to enforce the employee's statutorily mandated rights. Although the Board argues that it retains jurisdiction in such cases to ensure that the result reached is not repugnant to the NLRB, the great amount of deference that the Board pays to the arbitration committee's decision makes it extremely difficult for an employee to have an arbitration decision overturned. The time-lag occasioned by such deferral further undercuts stated labor policy. We hold that the NLRB's current policy of deferring non-contractual ULP claims to arbitration represents an abdication of the Board's statutory duty.

### III. CONCLUSION

The petition for review is granted. We remand the petitioner's claim to the Board and direct it to proceed to the merits of the complaint in accordance with this opinion. Congress ordained that the Board's armor be available to protect the rights of individual employees who claim unlawful discrimination by either their employer or their union. Unless the collective-bargaining agreement forms the complaint, the Board may not attorn such responsibility to an arbitrator.

*So ordered.*

WALD, Chief Judge, dissenting:

One simple but determinative point compels me to dissent from the panel opinion. My disagreement is over the meaning of the sentence in § 10(a) which provides that "[t]his power [to prevent unfair labor practices] shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law or otherwise." The majority relies on this sentence as a clear and unambiguous signal from Congress that the National Labor Relations Board ("NLRB" or "Board") is precluded from requiring ex-

haustion of contract remedies in unfair labor practice claims that do not involve issues of contract interpretation but rather concern language in the contract parallel to guarantees of the National Labor Relations Act ("NLRA" or "Act") itself. Thus, it says that *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), compels us to reverse the Board's deferral to arbitration of Hammontree's claim even though for decades the Board, with court approval, has insisted that mixed contract-interpretation/unfair labor practice questions go first to arbitration.[1] I find, however, that as a prohibition on the Board's power to require exhaustion of contract remedies, § 10(a) is far less clear than the panel suggests. Consequently, I conclude that *Chevron* compels deference to the Board's interpretation of § 10(a), which does not strike me as unreasonable. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782 ("[I]f the statute is ... ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."). After all, the parties to the contract here have voluntarily agreed upon the inclusion of an anti-discrimination provision and have specified arbitration as the initial remedy for its violation; why should that bargain be abrogated because the same guarantee appears in the Act?

Admittedly, if § 10(a) is read literally and in isolation, it does permit of the majority's interpretation. Since the Board's power to prevent unfair labor practices ("ULPs") "shall not be affected by *any* other means" (emphasis added), even the Board itself might appear to be precluded from establishing such means. But if this interpretation were correct, how would one explain the Board's consistent, court-approved policy requiring pre-arbitration deferral of ULP cases involving issues of contract interpretation?

The answer, I think, is that § 10(a) is basically an affirmative grant of authority to the Board. Thus, the more natural reading of the language is that no one *other than* the Board "shall affect," *i.e.,* shall diminish, the Board's authority over ULP claims. Indeed, a memorandum discussing § 10(a) of S.1958, the Senate bill that later became the NLRA, explains that the wording in question is "essential to clarify the paramount position of the Board under the Act" so as "to make it clear that although other agencies may be established by code, agreement or law to handle labor disputes, such other agencies can never divest the National Labor Relations Board of jurisdiction which it would otherwise have." Staff of Senate Comm. on Education and Labor, 74th Cong., 1st Sess., Memorandum Comparing S. 2926 and S.1958 (Comm. Print 1935) in 1 *Legislative History of the National Labor Relations Act of 1935,* 1357, 1323. In any case, while reasonable persons may differ as to the meaning of the sentence in issue, such reasonable differences are enough to require deference to the Board's construction of the section.[2]

Because I hold this view, I find it of little moment that the Board's interpretation here, which follows its earlier decision in *United Technologies, supra,* extends the *Collyer* pre-arbitration deferral doctrine to cases in which resolution of ULPs do not hinge on contractual interpretation. So long as application of a contractual provision to a grievant's case particularly and adequately addresses the situation giving rise to the ULP claim and the Board retains appellate jurisdiction, the Board has satis-

---

1. *See, e.g., Carey v. Westinghouse,* 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1963) (whether the dispute to be considered is one involving work assignment or one concerning representation, it is not within the exclusive jurisdiction of the Board, and there is no barrier to use of the arbitration procedure); *Local Union No. 2188, IBEW v. NLRB,* 494 F.2d 1087 (D.C.Cir.1974); *Associated Press v. NLRB,* 492 F.2d 662 (D.C.Cir. 1974); *United Technologies Corp.,* 268 N.L.R.B. 557 (1984); *Collyer Insulate Wire,* 192 N.L.R.B. 837 (1971).

2. The majority's invocation of two earlier bills containing arbitration provisions does not convince me otherwise. While it is true that these provisions were eliminated from the final bill, no persuasive materials from the Act's legislative history explain why; the two sentences from the Senate hearing cited by the majority (*supra* at 445) do not constitute the considered opinion of Congress.

fied its statutory obligation as the "Supreme Court of Labor." 1 *Legislative History* 1357.

Finally, I do not believe the Supreme Court cases cited by the majority are controlling. As the majority notes, none of them arose under the NLRA. And the language from *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 50, 94 S.Ct. 1011, 1020, 39 L.Ed.2d 147 (1974), cited by the majority at 444, does not say that the Board and the Board only can hear ULP claims in the first instance. Rather, it merely indicates that where an arbitral panel decides a contract grievance that parallels a ULP claim, the Board *may* subsequently hear the ULP claim *de novo*.

For the forgoing reasons, I would affirm the Board's order.

### ORDER

The Suggestions For Rehearing *en banc* of respondent and intervenor have been circulated to the full court. The taking of a vote was requested. Thereafter, a majority of the judges of the court in regular active service voted in favor of the suggestions. Upon consideration of the foregoing it is

Ordered, by the Court *en banc*, that this case will be considered and decided by the Court sitting *en banc*.