**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**UNITED STATES POSTAL SERVICE, Respondent.**

No. 89–9511.

United States Court of Appeals, Tenth Circuit.

June 19, 1990.

---

Howard E. Perlstein (David Seddelmeyer, with him on the brief), Supervisory Atty., N.L.R.B., Washington, D.C., for petitioner.

Lynn D. Poole (Stephen E. Alpern, Associate Gen. Counsel, Jesse L. Butler, Asst. Gen. Counsel, with him on the briefs), U.S.

**484**

Postal Service, Office of Labor Law, Washington, D.C., respondent.

Before SEYMOUR, MOORE and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

This matter comes before the court on application of the National Labor Relations Board ("NLRB" or "the Board"), pursuant to § 10(e) of the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. § 160(e), for enforcement of the Board's decision and order in *United States Postal Service and Charles B. Richardson*, 290 NLRB No. 20, 1988–89 NLRB Dec. (CCH) ¶ 15,081. The Board affirmed the findings and conclusions of the administrative law judge ("the ALJ") that respondent United States Postal Service ("USPS") violated § 8(a)(1) and (3) of the Act by refusing to reassign and promote Charles Richardson because he had engaged in protected concerted activity and that respondent violated § 8(a)(1) by threatening to harass and retaliate against Richardson because he had engaged in protected concerted activity.

I

Charles B. Richardson was hired by respondent on April 9, 1977, as a part-time clerk at respondent's Joplin, Missouri, facility. In the fall of 1979, Richardson contacted the Galena, Kansas, postmaster Clarence Bounds concerning a possible transfer to the Galena facility and, in November 1979, Bounds offered Richardson a position as a "part-time clerk-carrier." Richardson accepted the offer and transferred to Galena effective December 1, 1979, at least in part because of the possibility he would be able to transfer to a full-time carrier position in Galena within a few years. At the time of Richardson's trans-

fer, the Galena facility work force consisted of two full-time rural carriers, two full-time city route carriers and three part-time clerks.[1] Postmaster Bounds held the only supervisory position.

In February 1983, Richardson was assigned to work holidays and days off for Lester Clarkson, a full-time city route carrier. Thereafter, during the summer of 1984, a part-time carrier position was created in Galena in anticipation of Clarkson's retirement. Both Richardson and Timothy Weston, a part-time clerk, applied for reassignment to the new position. In early July, Bounds asked carriers Clarkson and Teddy Watkins to recommend an employee to fill the new position. Clarkson and Watkins then wrote a letter recommending Weston for the vacancy. In September 1984, after Bounds formally recommended Weston for reassignment to the new carrier position, USPS management in Wichita approved Weston's reassignment effective October 13, 1984, and notified Richardson that his reassignment request had been denied. After Clarkson retired in January 1985, Weston, Galena's only part-time carrier, was promoted to fill Clarkson's full-time letter carrier position.

Between 1981 and the time the new carrier position opened in 1984, Richardson filed several successful grievances against Bounds pursuant to the grievance machinery of the collective-bargaining agreement.[2] Richardson filed his first grievance in Spring 1981 when Bounds insisted that Richardson work as a temporary supervisor in Bounds' absence. The grievance was withdrawn at the first step when a union steward informed Bounds that the collective-bargaining agreement expressly prevented the postmaster from requiring an employee to work as a supervisor.

1. Pursuant to the collective-bargaining agreement, postal work in the clerical craft and in the carrier craft are not normally combined in a single job position. Collective Bargaining Agreement ("CBA"), Art. 7.2. When the USPS wishes to fill a full-time position, the agreement mandates that the most senior part-time employee in the same craft as the vacancy shall, under most circumstances, receive the job. When there are no eligible employees within the same craft, the USPS is free to select an outside

applicant or choose an employee from another craft. CBA, Art. 33.2.

2. Under the grievance procedure established by the collective-bargaining agreement, grievances arising at the Galena facility are heard at the first level by the local postmaster and at the second level by USPS management in Wichita, Kansas. CBA, Art. 15.2.

On September 21, 1981, Richardson filed a grievance over a warning Bounds issued to him. Bounds denied the grievance at the first step and Richardson appealed the denial of his grievance to the second step, where Bounds was overruled and the warning withdrawn. On October 13, 1981, Richardson filed a grievance when Bounds suspended Richardson for fourteen days. Bounds' first step decision was again overturned at the second level and Richardson received forty hours back pay (Richardson also received forty hours of back pay through a separate Equal Employment Opportunity ("EEO") complaint).

On February 24, 1984, Bounds disciplined Richardson for misdelivery of the mail and discourtesy to customers by issuing a letter of warning. In March 1984, Richardson filed a grievance concerning the letter and at the second stage of the grievance procedure the warning was reduced to a nondisciplinary "job discussion." Also in March 1984, Bounds denied Richardson a regular pay increase and Richardson filed a grievance in protest on March 28. (About March 26, Bounds also relieved Richardson of his substitute carrier duties, ostensibly because of customer complaints related to Richardson's performance and Richardson's inefficient work.) On April 6, the grievance concerning the pay increase was decided in Richardson's favor at the second level.

The General Counsel of the Board issued a complaint April 1, 1985, against respondent based upon charges filed by Richardson on January 9, 1985. The complaint alleged that respondent, through postmaster Bounds, violated § 8(a)(1) and (3) of the NLRA by threatening, harassing and refusing to reassign and promote Richardson because he had engaged in protected concerted activity by utilizing the grievance procedures of the collective-bargaining agreement.

A hearing was held before the ALJ July 10–12, 1985, and in a decision dated February 19, 1986, the ALJ held: (1) "By threatening to harass, retaliate against and pre-

vent the advancement of Charles B. Richardson because he filed grievances, Respondent has engaged in unfair labor practices in violation of Section 8(a)(1) of the Act," and (2) "By refusing to reassign and promote Charles B. Richardson because he filed grievances, Respondent has engaged and is engaging in unfair labor practices in violation of Section 8(a)(1) and (3) of the Act."

Accordingly, the ALJ ordered respondent to cease and desist engaging in the unfair labor practices and ordered respondent to perform certain affirmative actions designed to further the purposes of the Act. Specifically, respondent was ordered to offer Charles B. Richardson a full-time regular carrier position at the Galena facility, "displacing if necessary any employee assigned to such a position since 31 December 1984," and to make Richardson whole for any loss he may have suffered as a result of respondent's discriminatory activities.

Respondent filed exceptions to the ALJ's decision with the NLRB, which, in a decision and order dated July 29, 1988, "affirm[ed] the [ALJ]'s rulings, findings, and conclusions as modified" and modified the interest rate to be used in calculating the ordered remedy. 1988–89 NLRB Dec. (CCH) ¶ 15,082 at 28,296 (footnote omitted). Respondent subsequently refused to comply with the Board's decision and order, necessitating the Board's instant application to this court for enforcement.

## II

■ Respondent first contends the Board erred in concluding that the USPS had violated § 8(a)(1) and (3) of the Act. Section 8(a)(1) and (3) of the NLRA, 29 U.S.C. § 158(a)(1) and (3) provides:

(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;[3]

Employees shall have the right to self-organization, to form, join, or assist labor orga-

**3.** Section 7 of the NLRA, 29 U.S.C. § 157, provides in part:

. . . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. . . .

A violation of § 8(a)(3) is established where General Counsel demonstrates that an employer's opposition to protected union activity was a motivating factor in a decision to take adverse action against an employee *and* the employer is unable to demonstrate that the adverse action would have been taken even absent the protected activity. *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 403, 103 S.Ct. 2469, 2475, 76 L.Ed.2d 667 (1983), *aff'g Wright Line,* 251 NLRB No. 150, 1980 NLRB Dec. (CCH) ¶ 17,356.

█ In conducting our review, we must uphold the Board's factual findings if they are supported by substantial evidence on the record considered as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Artra Group, Inc. v. NLRB,* 730 F.2d 586, 590 (10th Cir.1984). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera,* 340 U.S. at 488, 71 S.Ct. at 464. However, the substantiality calculus does not mean that "a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Universal Camera,* 340 U.S. at 488, 71 S.Ct. at 465. "[This] court certainly does not retry the case. It [does not] undertake[ ] to weigh the credibility of witnesses"—the credibility determinations of an ALJ will not be upset absent extraordinary circumstances. *Artra Group,* 730 F.2d at 590, 592.

█ In our opinion, substantial evidence in the record supports the ALJ's

conclusions that Bounds threatened to harass and retaliate against Richardson and prevented Richardson's advancement because Richardson had repeatedly filed grievances challenging Bounds' conduct.[4]

Richardson testified that on July 11, 1984, Bounds told him that he would not be reassigned to the new carrier position "due to EEO complaints and union grievances [Richardson] filed against [Bounds]" and because Clarkson and Watkins had objected to Richardson's reassignment. According to Richardson, when Richardson reminded Bounds that he had originally transferred to Galena because Bounds had indicated that a regular letter carrier position might later become available, Bounds replied that he did "remember, but due to past actions on [Richardson's] part, it would not be to the Postal Service's advantage to reassign [Richardson] at this time."

In recommending Weston for reassignment to the new carrier position, Bounds supplied Wichita management with employment histories he had prepared concerning Weston and Richardson. The history about Richardson noted that Richardson had "filed several EEO Complaints and several Grievances since his transfer to the Galena office" and that he did not "perform as a team member."

Richardson also testified that on September 29, 1984, when Bounds informed Richardson that the new carrier position had been given to Weston, Bounds again said that Richardson did not get the position "due to EEO complaints and Union grievances" filed by Richardson against Bounds. According to Richardson, Bounds also told Richardson that "if [Richardson] didn't like his decision, [Richardson] had several ways of filing complaints available to [him]." The content of this conversation was confirmed in the testimony of Earl Williams, an employee in the Galena facility who

---

nizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities. . . .

4. Filing grievances pursuant to a collective-bargaining agreement constitutes protected concerted union activity within the meaning of § 7. *NLRB v. City Disposal Systems,* 465 U.S. 822, 836, 104 S.Ct. 1505, 1513, 79 L.Ed.2d 839 (1984).

overheard the conversation. Williams testified that, when Richardson asked Bounds why Bounds wouldn't transfer Richardson to the carrier position, Bounds replied: "Due to the EEO Complaints and Union Grievances you have filed against me." (Williams was the only employee to overhear the conversation.) Not surprisingly, Bounds testified that he made no such statement.

Richardson also testified that around November 23, 1984, Bounds rejected a request by Richardson for additional working hours, adding that "if [Richardson] didn't like the hours in the Post Office, [Richardson] could quit and find a job elsewhere" and that "[Bounds] was going to make things as hard on [Richardson] as he could." Also on November 23, Richardson complained that Bounds had scheduled Weston to work across craft lines as a clerk when Richardson, a clerk, was available. Bounds again replied that Richardson could file a grievance or find another job. Richardson subsequently filed a grievance and was awarded back pay at the second grievance step for the time Weston was assigned to work as a clerk.

Finally, on January 21, 1985, Bounds reduced Richardson's pay by six minutes over a time-clock dispute. At the time of the incident, Richardson told Bounds he would file a grievance, to which Bounds responded, "Chuck, you just keep filing grievances and I'll keep finding ways of getting back at you."

Respondent's challenge to this portion of the ALJ's findings focuses on the credibility determinations made by the ALJ. In arriving at his findings, the ALJ made specific reference to conflicts in the testimony of the parties' respective witnesses and determined to credit the testimony of Richardson and Williams over that of Bounds. Specifically, the ALJ commented that Bounds demonstrated a lack of candor, evasiveness and nervousness during his testimony, which reflected adversely on his credibility.

Respondent disagrees with the ALJ's findings as to credibility, especially as to the testimony of Williams, a man admittedly on unfriendly terms with Bounds. However, the ALJ was in a unique position to observe the demeanor of the testifying witnesses, and we find no cause to overturn his credibility determinations. As such, we affirm his findings that Bounds threatened to harass and retaliate against Richardson for Richardson's grievance-filing activity and that Bounds prevented Richardson's advancement and reassignment for the same impermissible reason.

■ Having affirmed the finding that Bounds' opposition to Richardson's protected union activity was a motivating factor in his actions against Richardson, we now examine, consistent with *Wright Line*'s allocation of the burdens of proof, whether respondent demonstrated that the adverse action would have been taken even in the absence of the protected activity. To that end, the USPS contends that, notwithstanding his history of filing grievances, "overwhelming evidence" demonstrates that Richardson was not reassigned to the open carrier position because he was a singularly dreadful mail carrier.

In support of its position, respondent directs our attention to evidence in the record of a series of documented customer complaints logged against Richardson. (Twelve of the nineteen documented complaints concerned reported incidents of mail misdelivered by Richardson.) Additionally, respondent's witnesses testified that postal customers repeatedly approached Bounds, Clarkson and Watkins on the street to complain about Richardson's performance as a carrier. Clarkson testified that these complaints formed the basis for Clarkson's and Watkins' written opposition to Richardson's reassignment as a carrier. Bounds and Weston also testified that Richardson was a difficult employee to supervise, that he was prone to make mistakes, and that he resented authority. Clarkson further testified that he found Richardson extremely difficult to train.

In evaluating the above evidence of Richardson's purported incompetence, the ALJ noted that most of the customer complaints formally documented against Richardson were documented by Bounds and that

Bounds only bothered to formally document complaints against Richardson, not his other carriers. The ALJ noted that although most of the complaints documented against Richardson concerned misdeliveries of mail, Bounds admitted that he did not consider identical reports of carrier Weston's misdeliveries to be "complaints" and did not formally document them as such. The ALJ found no evidence that any other carrier had ever had a customer complaint of misdelivered mail formally documented against him by Bounds, even though the city route carriers who testified admitted that they also had made misdeliveries. Accordingly, the ALJ concluded that he could not sufficiently weigh the significance of the documented complaints against Richardson for purposes of evaluating Richardson's level of performance. He also concluded that Bounds appeared to have singled Richardson out for disparate treatment by documenting his misdeliveries:

> Respondent contends that Bounds made the reassignment decision based on the superiority of Weston's performance, the "customer complaints" against Richardson and the Clarkson/Watkins' letter recommending Weston. The significance of the superiority of Weston's performance as a carrier is rendered suspect by the fact that Bounds made his decision no later than 11 July—over two months before Weston began carrying mail.[5] Similarly, the timing and manner of collection and the disparate nature of the "complaints" documented by Bounds against Richardson rob them of any probative value. Even if it were concluded that Bounds had not been "papering a

case" against Richardson, the absence of any probative evidence concerning the number and nature of complaints received about other carriers makes it impossible to evaluate the significance of the "complaints" relating to Richardson.... Accordingly, I conclude that the justifications advanced by Respondent were wholly pretextual. The real reason for refusing to reassign Richardson was the one repeatedly iterated by Bounds: Richardson filed too many grievances, almost all of which resulted in Bounds' decisions being reversed by his superiors.

In light of the evidence chronicled above, and based on our review of the record as a whole, we conclude that substantial evidence supports the ALJ's finding that Bounds' proffered justification for not reassigning Richardson was pretextual and thus that the adverse actions would not have been taken absent Richardson's history of filing grievances against Bounds.

## III

In an alternate challenge to the NLRB order, the USPS asserts the Board erred in refusing to defer the charge to the parties' collective-bargaining procedures.[6]

■ The NLRB is empowered with the exclusive statutory authority to prevent unfair labor practices:

> The Board is empowered ... to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has

5. Weston began carrying the mail on September 13, 1984.

6. Article 15 of the collective-bargaining agreement ("the agreement") between the USPS and the American Postal Workers Union and the National Association of Letter Carriers (collectively referred to hereinafter as "the Unions") establishes a grievance arbitration procedure and defines a grievance as:

> a dispute, difference, disagreement or complaint between the parties related to wages, hours, and conditions of employment. A grievance shall include, but is not limited to, the complaint of an employee or of the Un-

ions which involves the interpretation, application of, or compliance with the provisions of this Agreement or any local Memorandum of Understanding not in conflict with this Agreement.

Additionally, Article 3 of the agreement provides that the USPS may transfer and assign employees and determine the personnel by which its operations are to be conducted, but only consistent with applicable laws. Based upon these two provisions, the USPS contends the instant "grievance" is arbitrable under the collective bargaining agreement.

been or may be established by agreement, law, or otherwise . . . .

NLRA § 10(a), 29 U.S.C. § 160(a). Notwithstanding this exclusive grant of jurisdiction, the Board also has wide discretion to decline to exercise its authority and to defer to the method of dispute resolution mandated by a collective-bargaining agreement if deferral will serve the fundamental national labor policy objectives established by Congress in the NLRA. *Carey v. Westinghouse Elec. Corp.*, 375 U.S. 261, 264–66, 84 S.Ct. 401, 405–06, 11 L.Ed.2d 320 (1964); *NLRB v. Northeast Oklahoma City Mfg. Co.*, 631 F.2d 669, 673 (10th Cir.1980). However, "[o]nce the Board has exercised its discretionary authority to establish a deferral policy, its original discretion is displaced. The Board must thereafter follow the policy it has adopted 'unless and until it explicitly changes that policy.'" 631 F.2d at 673–74 (quoting *NLRB v. Pincus Bros., Inc.–Maxwell*, 620 F.2d 367, 380 (3d Cir. 1980) (Garth, J., concurring)).[7]

█ The Board's present pre-arbitration deferral policy was first announced in *Collyer Insulated Wire*, 192 NLRB No. 150, 1971 NLRB Dec. (CCH) ¶ 23,385, and later reaffirmed in *United Technologies Corp.*, 268 NLRB No. 83, 1983–84 NLRB Dec. (CCH) ¶ 16,027 (1984):

The *Collyer* majority articulated several factors favoring deferral [to the parties'

grievance-arbitration machinery]: The dispute arose within the confines of a long and productive collective-bargaining relationship; there was no claim of employer animosity to the employees' exercise of protected rights; the parties' contract provided for arbitration in a very broad range of disputes; the arbitration clause clearly encompassed the dispute at issue; the employer had asserted its willingness to utilize arbitration to resolve the dispute; and the dispute was eminently well suited to resolution by arbitration.

*United Technologies*, 1983–84 NLRB Dec. 16,027, at 27,310–11; *Collyer*, 1971 NLRB Dec. ¶ 23,385, at 30,226.

The USPS first moved for deferral to the grievance arbitration procedures before the ALJ. The ALJ denied the motion because:

First, it is not altogether clear that the issues presented in the grievance process and the issues presented here are of sufficient similarity [to warrant deferral]. Clearly, if the prima facie case presented by General Counsel were to be believed, deferral aside as a legal issue, there's no question that the Act would have been violated.

Apparently there is significant difficulty in the Union's mind as to whether the

---

**7.** Unfortunately, with respect to claims such as the claim in the instant case—where the charge alleges unfair labor practices under § 8 of the NLRA and does not require interpretation of the collective-bargaining agreement—the Board has explicitly and dramatically changed its policy twice in the past thirteen years. Six years after *Collyer Insulated Wire*, 192 NLRB No. 150, 1971 NLRB Dec. (CCH) ¶ 23,385 (1971), the Board held that it would not defer cases alleging violations of § 8(a)(1) and (3) and 8(b)(1)(A) and (2). *General American Transp. Corp.*, 228 NLRB No. 102, 1976–77 NLRB Dec. (CCH) ¶ 17,961 (1977). Seven years after *General American Transp.*, in *United Technologies Corp.*, 268 NLRB No. 83, 1983–84 NLRB Dec. (CCH) ¶ 16,027 (1984), the Board expressly overturned *General American Transp.* and held that deferral would thereafter be allowed even in cases alleging unfair labor practices, so long as deferral was consistent with the principles of *Collyer*. (One commentator has suggested that the NLRB's shifting deferral policy is a "meandering ... marked by advances as well as major retreats, followed by

uncertain returns to previously abandoned principles." Peck, *A Proposal to End NLRB Deferral to the Arbitration Process*, 60 Wash.L.Rev. 355, 387 (1985).)

Recently, in *Hammontree v. NLRB*, 894 F.2d 438 (D.C.Cir.1990), the D.C. Circuit held that the Board's pre-arbitration deferral policy as expressed in *United Technologies* contravenes the plain meaning of § 10(a) of the NLRA. The *Hammontree* court concluded that the Board cannot, consistent with the Board's exclusive power to remedy unfair labor practices under § 10(a), defer unfair labor practice claims that do not involve the interpretation or application of provisions of the collective-bargaining agreement.

Here, the parties have not argued the related issues of whether *United Technologies* is consistent with the NLRA and thus whether the NLRB could ever properly defer unfair labor practice charges such as those alleged in the instant case. Accordingly, and because we have affirmed the Board's decision *not* to defer on alternate grounds, we leave these issues for another day.

contract would have been violated by the identical content.

Secondly, and more significantly, the Charging Party in this case is Mr. Richardson, not the Union. Mr. Richardson, as you pointed out in your argument, sought to use the grievance process and the utilization of that process was denied him by the Union. Mr. Richardson's rights are the ones at stake, not the Union's.

Consequently, it would be totally inappropriate to deny him the protection of the National Labor Relations Act, based upon the actions of the Union.

In his written order, the ALJ reaffirmed without further discussion his denial of respondent's motion to defer.

On review, the Board agreed that deferral was inappropriate, but noted that "in doing so we rely on the fact that this grievance-arbitration procedure has been totally ineffective in curbing the Respondent's proclivity to retaliate against the Charging Party for filing grievances." 1988–89 NLRB Dec. (CCH) ¶ 15,081, at 28,-297. The Board continued:

We find that the record evidence establishes that the Respondent has engaged in a series of reprisals against Richardson for his grievance-filing activity. This pattern of hostile conduct is fundamentally at odds with the Act and the policy behind deferral. The facts of the case at bar show a continuation of the earlier coercive conduct, and the Respondent's recent statements reveal an intent to retaliate against Richardson in the future. In these circumstances, the grievance-arbitration machinery we are being asked to defer to has become meaningless in the extended campaign of reprisals against Richardson. Accordingly, we will not require Richardson to perform what has clearly become a futile act. The Respondent's own words have established the futility of future grievance-filing by Richardson.

Here, we hold that the Board's focus on the futility of Richardson's further use of the grievance machinery amounts to a finding, consistent with the second *Collyer*

factor set forth above, "of enmity by Respondent to employees' exercise of protected rights." *Collyer*, 1971 NLRB Dec. (CCH) ¶ 23,385, at 30,226. We have already recited the record evidence demonstrating that Bounds had retaliated against Richardson and had threatened further retaliation because of Richardson's grievance-filing activities. (See section I.) At a minimum, that evidence ably demonstrates that Bounds was not planning on altering his conduct towards Richardson as a result of the grievance process. To repeat, Richardson testified that Bounds told him, "Chuck, you just keep filing grievances and I'll keep finding ways of getting back at you."

We therefore conclude that, because the Board's decision is consistent with its pre-arbitration deferral policy as expressed in *Collyer* and *United Technologies*, the Board did not abuse its discretion in declining to defer its jurisdiction over this case.

## IV

In conclusion, we hold that the findings of the NLRB and the ALJ are supported by substantial evidence based on the record considered as a whole. Accordingly, we Affirm the NLRB's determination that respondent's challenged activities violated § 8(a)(1) and (3) of the NLRA. Additionally, we hold that the Board did not abuse its discretion in refusing to defer this case to the grievance arbitration machinery of the collective-bargaining agreement. The order of the NLRB shall be enforced.