United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued February 2, 2000 Decided March 17, 2000 

 No. 99-1176

 GTE Service Corporation, et al., 
 Petitioners

 v.

 Federal Communications Commission and 
 United States of America, 
 Respondents

 NorthPoint Communications, Inc., et al., 
 Intervenors

 Consolidated with 
 99-1201

 On Petitions for Review of an Order of the 
 Federal Communications Commission

 Mark L. Evans argued the cause for petitioners. With him 
on the briefs were William P. Barr, M. Edward Whelan III., 

John F. Raposa, Dan L. Poole, Robert B. McKenna, Michael 
K. Kellogg, Lawrence E. Sarjeant, Linda Kent, John W. 
Hunter, and Julie E. Rones.

 Laurence N. Bourne, Counsel, Federal Communications 
Commission, argued the cause for respondents. With him on 
the brief were Joel I. Klein, Assistant Attorney General, 
United States Department of Justice, Catherine G. O'Sulli-
van and Nancy C. Garrison, Attorneys, Christopher J. 
Wright, General Counsel, Federal Communications Commis-
sion, and John E. Ingle, Deputy Associate General Counsel.

 Mark C. Rosenblum, Peter D. Keisler, James P. Young, 
William Single, IV., Mark D. Schneider, Ruth M. Milkman, 
Robert J. Aamoth, Jonathan Jacob Nadler, Leon M. Kestenb-
aum, Jay C. Keithley, H. Richard Juhnke, Glenn B. Manish-
in, Christy C. Kunin, Renee R. Crittendon, Randall B. Lowe, 
Eric J. Branfman, Andrew D. Lipman, and Rodney L. Joyce. 
Harold R. Juhnke were on the brief for intervenors AT & T 
Corporation, et al. Michael B. Fingerhut, David W. Carpen-
ter, Jodie L. Kelley, Mark B. Ehrlich, and Emily M. 
Williams entered appearances.

 Before: Edwards, Chief Judge, Ginsburg and Sentelle, 
Circuit Judges.

 Opinion for the Court filed by Chief Judge Edwards.

 Edwards, Chief Judge: Section 251(c)(6) of the Telecommu-
nications Act of 1996 (the "Act"), 47 U.S.C. s 251(c)(6), impos-
es a statutory duty on incumbent local exchange carriers 
("LECs") to provide physical or virtual collocation for com-
peting providers ("competitors"). The Act also requires the 
Federal Communications Commission ("FCC" or "Commis-
sion") to issue implementing regulations to fulfill the colloca-
tion mandate. See 47 U.S.C. s 251(d)(1). In March 1999, in 
Deployment of Wireline Services Offering Advanced Telecom-
munications Capability ("Collocation Order"), 14 FCC Rcd 
4761 (1999), the FCC issued rules purporting to implement 
s 251(c)(6). According to the Commission, a principal pur-

pose of the Collocation Order is to "adopt ... additional 
measures to further facilitate the development of competition 
in the advanced services market ... [by] strengthen[ing] ... 
collocation rules to reduce the costs and delays faced by 
competitors that seek to collocate equipment in an incumbent 
LEC's central office." Id. at 4764 p 6.

 The petitioners before the court are LECs who challenge 
the Collocation Order on the ground that it impermissibly 
imposes intrusive "physical collocation" requirements on 
them. Section 251(c)(6) says that LECs must provide for 
physical collocation of equipment "necessary for interconnec-
tion or access to unbundled network elements at the premises 
of the local exchange carrier." 47 U.S.C. s 251(c)(6). The 
FCC has taken the position that "necessary" means that "an 
incumbent LEC may not refuse to permit collocation of any 
equipment that is 'used or useful' for either interconnection or 
access to unbundled network elements, regardless of other 
functionalities inherent in such equipment." Collocation Or-
der, 14 FCC Rcd at 4776-77 p 28. Petitioners argue that, 
with the adoption of this rule, the FCC seeks to require 
collocation well beyond what has been authorized by Con-
gress. Petitioners also claim that the Collocation Order is 
unauthorized and unreasonable in forcing LECs to offer 
competitors "cageless collocation," defining "premises" in 
s 251(c)(6) to include a LEC's central office and adjacent 
property, allowing competitors to have too much say over the 
placement of their equipment in a LEC's central office, and 
depriving LECs of an opportunity to gain full recovery of the 
initial costs of preparing collocation space for competitors.

 Petitioners' position that "physical collocation" under the 
Act is limited to caged collocation is meritless, as is the claim 
that the FCC's definition of "premises" is unduly broad. We 
also reject petitioners' challenge to the cost recovery mecha-
nism under the Collocation Order. We agree with petition-
ers, however, that the FCC's interpretations of "necessary" 
and "physical collocation" appear to be impermissibly broad. 
We therefore vacate the challenged Collocation Order insofar 
as it embraces unduly broad definitions of "necessary" and 

"physical collocation" and remand for further consideration 
by the FCC.

 I. Background

 In recent years, the FCC has sought to increase competi-
tion in the market for interstate access services, which con-
nect long-distance companies with local telephone networks 
and subscribers. In 1992 and 1993, the Commission issued 
orders requiring LECs to set aside portions of their premises 
for occupation and use by competitive access providers, thus 
generating legal battles that have continued to the present. 
See Bell Atlantic Telephone Cos. v. FCC, 24 F.3d 1441 (D.C. 
Cir. 1994). In their initial attempts to require LECs to 
permit physical collocation of competitors' equipment on de-
mand, the FCC relied on s 201(a) of the Communications Act 
of 1934, 47 U.S.C. s 201(a), which empowers the agency to 
order "physical connections" as necessary for the public inter-
est. The FCC reasoned that its efforts to create a level 
playing field of competition in the market for interstate 
access services served the public interest. On review, howev-
er, this court upheld a challenge to the Commission's physical 
collocation rule, finding that nothing in the Communications 
Act of 1934 explicitly authorized the FCC to order takings of 
LECs' property through physical collocation. See id. at 1446 
("The Commission's power to order 'physical connections,' 
undoubtedly of broad scope, does not supply a clear warrant 
to grant third parties a license to exclusive physical occupa-
tion of a section of the LEC's central offices."). The court 
was concerned that

 Chevron deference to agency action that creates a broad 
 class of takings claims, compensable in the Court of 
 Claims, would allow agencies to use statutory silence or 
 ambiguity to expose the Treasury to liability both mas-
 sive and unforeseen.
 
Id. at 1445 (citing Chevron U.S.A. Inc. v. Natural Resources 
Defense Council, Inc., 467 U.S. 837 (1984)). Thus, absent a 
more definite congressional authorization, the court was un-

willing to defer to the FCC's unduly broad reading of 
s 201(a).

 The FCC responded to the court's ruling in Bell Atlantic 
Telephone by adopting new rules that gave LECs the option 
to rely more on "virtual collocation" in lieu of physical colloca-
tion. See Expanded Interconnection with Local Telephone 
Company Facilities, Memorandum Opinion and Order, 9 FCC 
Rcd 5154 (1994). Virtual collocation allows a LEC to retain 
physical control of the equipment, along with the responsibili-
ty for installing, maintaining, and repairing it. Virtual collo-
cation therefore minimizes the takings problem, because com-
petitors do not have physical access to a LEC's property. 
The LECs petitioned for review of this order, but the issue on 
appeal was rendered moot with the passage of the Telecom-
munications Act of 1996. The court therefore remanded the 
case for reconsideration in light of 47 U.S.C. ss 251(c)(6) & 
(g), as applied after the enactment of the Telecommunications 
Act of 1996. See Pacific Bell v. FCC, 81 F.3d 1147 (D.C. Cir. 
1996).

 The 1996 Act completely revamped the statutory landscape 
by providing explicit congressional authorization for physical 
collocation. Under s 251(c)(6), LECs are now required

 to provide, on rates, terms, and conditions that are just, 
 reasonable, and nondiscriminatory, for physical colloca-
 tion of equipment necessary for interconnection or access 
 to unbundled network elements at the premises of the 
 local exchange carrier, except that the carrier may pro-
 vide for virtual collocation if the local exchange carrier 
 demonstrates to the State commission that physical collo-
 cation is not practical for technical reasons or because of 
 space limitations.
 
47 U.S.C. s 251(c)(6) (emphasis added).

 Armed with this explicit congressional authorization, the 
FCC first adopted rules resembling earlier orders mandating 
collocation. See Implementation of the Local Competition 

Provisions in the Telecommunications Act of 1996 (CC Dock-
et No. 96-98), 11 FCC Rcd 15499 ("Local Competition Or-
der"), aff'd in part and rev'd in part, Iowa Utils. Bd. v. FCC, 
120 F.3d 753 (8th Cir. 1997), rev'd in part and aff'd in part, 
AT & T Corp. v. Iowa Utils. Bd., 525 U.S. 366 (1999). 
However, under the heat of critical commentary, the Com-
mission decided that more was necessary "to remove[ ] barri-
ers to competition so that competing providers are able to 
compete effectively with incumbent LECs and their affiliates 
in the provision of advanced services." Collocation Order, 14 
FCC Rcd at 4763 p 3. After studying the issue and review-
ing comments, the FCC "adopted several measures" in the 
Collocation Order that are designed to "promote competition 
in the advanced services market." Id. p 4.

 The Collocation Order obviously strengthens the Commis-
sion's stance on physical collocation. First, the Order re-
quires LECs to allow competitors to collocate "all equipment 
that is necessary for interconnection or access to unbundled 
network elements, regardless of whether such equipment 
includes a switching functionality, provides enhanced service 
capabilities, or offers other functionalities." Id. at 4776 p 28. 
In particular, the Order says that "an incumbent LEC may 
not refuse to permit collocation of any equipment that is 'used 
or useful' for either interconnection or access to unbundled 
network elements, regardless of other functionalities inherent 
in such equipment." Id. at 4776-77 p 28. Second, the Order 
requires LECs to offer competitors both caged and cageless 
collocation. Third, the Order requires LECs to offer colloca-
tion space in both their central offices and in adjacent con-
trolled environmental vaults or similar structures; and it 
prohibits LECs from imposing unreasonable minimum space 
requirements on collocators. Finally, the Order requires 
LECs to bear the initial costs of preparing collocation space 
for their competitors, as opposed to requiring the first collo-
cator to bear the entire cost of preparing new collocation 
space--and thus bear the risk of unoccupied space--as an up-
front charge. Petitioners claim that these new rules are 

neither authorized by the Act nor justified by reasoned 
decisionmaking.

 II. Discussion

A. Standard of Review

 The principal issue in this case is whether the Commis-
sion's interpretation of s 251(c)(6) of the Telecommunications 
Act of 1996 can withstand scrutiny. In particular, petitioners 
challenge the FCC's Collocation Order on the ground that the 
agency's constructions of "necessary," "physical collocation," 
and "premises" will allow unauthorized takings of LEC prop-
erty by their competitors.

 As this court noted in Bell Atlantic Telephone Companies 
v. FCC, 131 F.3d 1044 (D.C. Cir. 1997),

 Chevron U.S.A., Inc. v. Natural Resources Defense 
 Council, 467 U.S. 837 (1984), governs review of agency 
 interpretation of a statute which the agency administers. 
 Under the first step of Chevron, the reviewing court 
 "must first exhaust the 'traditional tools of statutory 
 construction' to determine whether Congress has spoken 
 to the precise question at issue." Natural Resources 
 Defense Council, Inc. v. Browner, 57 F.3d 1122, 1125 
 (D.C. Cir. 1995) (quoting Chevron, 467 U.S. at 843 n.9, 
 104 S. Ct. at 2782 n.9). The traditional tools include 
 examination of the statute's text, legislative history, and 
 structure, see Southern California Edison Co. v. FERC, 
 116 F.3d 507, 515 (D.C. Cir. 1997); as well as its purpose, 
 see First Nat'l Bank & Trust v. National Credit Union, 
 90 F.3d 525, 529-30 (D.C. Cir. 1996). This inquiry using 
 the traditional tools of construction may be characterized 
 as a search for the plain meaning of the statute. If this 
 search yields a clear result, then Congress has expressed 
 its intention as to the question, and deference is not 
 appropriate. See Hammontree v. NLRB, 894 F.2d 438, 
 441 (D.C. Cir. 1990). If, however, "the statute is silent 
 or ambiguous with respect to the specific issue," Chev-
 ron, 467 U.S. at 843, 104 S. Ct. at 2782, Congress has not 
 
 spoken clearly, and a permissible agency interpretation 
 of the statute merits judicial deference. Id.
 
Id. at 1046-47.

 There is no doubt here that Congress has delegated to the 
FCC the authority to issue regulations implementing 
s 251(c)(6). See 47 U.S.C. s 251(d)(1). It is equally clear 
that, given the complexity of the task at hand, any search for 
"plain meaning" in the statute is fruitless. The disputed 
terms at issue--"necessary," "physical collocation," and 
"premises"--all bear relatively clear definitions if taken out of 
the context of the statutory provision in which they are found. 
The problem here is that these terms are found in a circum-
scribed statutory provision that seeks to ensure competition 
in areas of advanced technology in telecommunications; i.e., 
the statute gives competitors access to the private property of 
LECs by requiring LECs to offer physical collocation on 
reasonable terms, but this access is neither open-ended nor is 
it even required if not practical for technical reasons or 
because of space limitations. This is hardly the stuff of "plain 
meaning."

 Because the disputed terms in s 251(c)(6) are ambiguous in 
their meanings, we are required to consider the Commission's 
interpretations. Under the second step of Chevron, we will 
defer to the Commission's interpretations if they are reason-
able and consistent with the statutory purpose. See Troy 
Corp. v. Browner, 120 F.3d 277, 285 (D.C. Cir. 1997) (noting 
that an agency's interpretation must be "reasonable and 
consistent with the statutory purpose"); City of Cleveland v. 
U.S. Nuclear Regulatory Comm'n, 68 F.3d 1361, 1367 (D.C. 
Cir. 1995) (providing that an agency's interpretation must be 
"reasonable and consistent with the statutory scheme and 
legislative history"). However, a court will not uphold an 
interpretation "that diverges from any realistic meaning of 
the statute." Massachusetts v. Department of Transp., 93 
F.3d 890, 893 (D.C. Cir. 1996). In this case, as will be shown 
below, the FCC's interpretations of "necessary" and "physical 
collocation" appear to diverge from any realistic meaning of 
the statute, because the Commission has favored the LECs' 

competitors in ways that exceed what is "necessary" to 
achieve reasonable "physical collocation" and in ways that 
may result in unnecessary takings of LEC property.

 Petitioners' claim that the Collocation Order unfairly pre-
cludes LECs from gaining full recovery of the initial costs of 
preparing collocation space for competitors raises a matter 
that is subject to review under the traditional "arbitrary and 
capricious" standard. As the Supreme Court explained in 
Motor Vehicle Manufacturers Ass'n v. State Farm Mutual 
Automobile Insurance Co., 463 U.S. 29, 43 (1983),

 [t]he scope of review under the "arbitrary and capri-
 cious" standard is narrow and a court is not to substitute 
 its judgment for that of the agency. Nevertheless, the 
 agency must examine the relevant data and articulate a 
 satisfactory explanation for its action including a "ration-
 al connection between the facts found and the choice 
 made." Burlington Truck Lines, Inc. v. United States, 
 371 U.S. 156, 168 (1962). In reviewing that explanation, 
 we must "consider whether the decision was based on a 
 consideration of the relevant factors and whether there 
 has been a clear error of judgment." Bowman Trans-
 portation, Inc. v. Arkansas-Best Freight System, Inc., 
 [419 U.S. 281, 285 (1974)]; Citizens to Preserve Overton 
 Park v. Volpe, [401 U.S. 402, 416 (1971)]. Normally, an 
 agency rule would be arbitrary and capricious if the 
 agency has relied on factors which Congress has not 
 intended it to consider, entirely failed to consider an 
 important aspect of the problem, offered an explanation 
 for its decision that runs counter to the evidence before 
 the agency, or is so implausible that it could not be 
 ascribed to a difference in view or the product of agency 
 expertise. The reviewing court should not attempt itself 
 to make up for such deficiencies; we may not supply a 
 reasoned basis for the agency's action that the agency 
 itself has not given. SEC v. Chenery Corp., 332 U.S. 194, 
 196 (1947). We will, however, "uphold a decision of less 
 than ideal clarity if the agency's path may reasonably be 
 discerned." Bowman Transportation, Inc. v. Arkansas-
 
 Best Freight System, Inc., [419 U.S. at 286]. See also 
 Camp v. Pitts, 411 U.S. 138, 142-143 (1973) (per curiam).
 
Id.; see also Communications Satellite Corp. v. FCC, 836 
F.2d 623 (1988) (quoting Motor Vehicle Mfrs. Ass'ns, 463 U.S. 
at 43). As we indicate below, the cost allocation rules under 
the Collocation Order easily survive arbitrary and capricious 
review. There is a discernible, reasoned basis for the agen-
cy's action, and the decision reached by the agency does not 
reflect a clear error of judgment.

 We now turn to a consideration of the statutory interpreta-
tion questions, focused on the meaning of s 251(c)(6).

B. "Necessary"

 The first question in this case centers on the meaning of 
"necessary" under 47 U.S.C. s 251(c)(6). As noted above, the 
statute requires LECs to provide physical collocation of 
equipment as "necessary for interconnection or access to 
unbundled network elements at the premises of the local 
exchange carrier." This statutory provision is, at first blush, 
fairly straightforward. Something is necessary if it is re-
quired or indispensable to achieve a certain result. Thus, 
competitors who are protected by the Act have a right to 
collocate any equipment that is required or indispensable to 
achieve interconnection or access to unbundled network ele-
ments at the premises of the local exchange carrier. In the 
Collocation Order, however, the FCC appears to ignore the 
statutory reference to "necessary" in requiring LECs to 
collocate any competitors' equipment that is " 'used or useful' 
for either interconnection or access to unbundled network 
elements, regardless of other functionalities inherent in such 
equipment." 14 FCC Rcd at 4776-77 p 28. Petitioners argue 
that by interpreting "necessary" as "used or useful" and by 
permitting competitors to collocate equipment that may do 
more than what is required to achieve interconnection or 
access, the FCC's Collocation Order impermissibly invites 
unwarranted intrusion upon LECs' property rights. The 
petitioners' argument has merit, for the Collocation Order as 
presently written seems overly broad and disconnected from 
the statutory purpose enunciated in s 251(c)(6).

 The Collocation Order makes two critical points in inter-
preting "necessary" under s 251(c)(6): First, the Order says 
that "an incumbent LEC may not refuse to permit collocation 
of any equipment that is 'used or useful' for either intercon-
nection or access to unbundled network elements, regardless 
of other functionalities inherent in such equipment." Id. at 
4776-77 p 28 (emphasis added). Second, the Order makes it 
clear that LECs must allow competitors to collocate "all 
equipment that is necessary for interconnection or access to 
unbundled network elements, regardless of whether such 
equipment includes a switching functionality, provides en-
hanced services capabilities, or offers other functionalities." 
Id. at 4776 p 28 (emphasis added). In other words, the 
Collocation Order appears to permit competitors to collocate 
equipment that may do more than what is required to achieve 
interconnection or access.

 Petitioners' concerns with the breadth of the Collocation 
Order are not idle. The Supreme Court recently had occa-
sion to address a similar problem in reviewing a challenge to 
the FCC's interpretation of 47 U.S.C. s 251(d)(2), which 
provides, in relevant part, that

 [i]n determining what network elements should be made 
 available for purposes of subsection (c)(3) of this section, 
 the Commission shall consider ... whether ... access to 
 such network elements as are proprietary in nature is 
 necessary.
 
47 U.S.C. s 251(d)(2). In AT & T Corp. v. Iowa Utilities 
Board, 525 U.S. 366 (1999), the Court faced a controversy 
over what "necessary" meant in the context of s 251(d)(2). 
See id. at 388. The Court rejected the FCC's formulation, 
concluding that "the Act requires the FCC to apply some 
limiting standard, rationally related to the goals of the Act, 
which it has simply failed to do." Id. The Court noted that

 the Commission announced that it would regard the 
 'necessary' standard as having been met, regardless of 
 whether 'requesting carriers can obtain the requested 
 proprietary element from a source other than the incum-
 bent,' since '[r]equiring new entrants to duplicate unnec-
 
 essarily even a part of the incumbent's network could 
 generate delay and higher costs for new entrants, and 
 thereby impede entry by competing local providers and 
 delay competition, contrary to the goals of the 1996 Act.' 
 ... The Commission cannot, consistent with the statute, 
 blind itself to the availability of elements outside the 
 incumbent's network. That failing alone would require 
 the Commission's rule to be set aside. In addition, 
 however, the Commission's assumption that any increase 
 in cost (or decrease in quality) imposed by denial of a 
 network element renders access to that element 'neces-
 sary' ... is simply not in accord with the ordinary and 
 fair meaning of [the statute's] terms.
 
Id. at 389-90.

 As is clear from the Court's judgment in Iowa Utilities 
Board, a statutory reference to "necessary" must be con-
strued in a fashion that is consistent with the ordinary and 
fair meaning of the word, i.e., so as to limit "necessary" to 
that which is required to achieve a desired goal. The Court's 
admonition seems particularly relevant here where a broader 
construction of "necessary" under s 251(c)(6) might result in 
an unnecessary taking of private property.

 One clear example of a problem that is raised by the 
breadth of the Collocation Order's interpretation of "neces-
sary" is seen in the Commission's rule requiring LECs to 
allow collocating competitors to interconnect their equipment 
with other collocating carriers. See Collocation Order, 14 
FCC Rcd at 4780 p 33 ("We see no reason for the incumbent 
LEC to refuse to permit the collocating carriers to cross-
connect their equipment, subject only to the same reasonable 
safety requirements that the incumbent LEC imposes on its 
own equipment."). The obvious problem with this rule is that 
the cross-connects requirement imposes an obligation on 
LECs that has no apparent basis in the statute. Section 
251(c)(6) is focused solely on connecting new competitors to 
LECs' networks. In fact, the Commission does not even 
attempt to show that cross-connects are in any sense "neces-
sary for interconnection or access to unbundled network 

elements." Rather, the Commission is almost cavalier in 
suggesting that cross-connects are efficient and therefore 
justified under s 251(c)(6). This will not do. The statute 
requires LECs to provide physical collocation of equipment as 
"necessary for interconnection or access to unbundled net-
work elements at the premises of the local exchange carrier," 
and nothing more. As the Supreme Court made clear in 
Iowa Utilities Board, the FCC cannot reasonably blind itself 
to statutory terms in the name of efficiency. Chevron defer-
ence does not bow to such unbridled agency action.

 There are other examples, as well, to demonstrate that the 
FCC's interpretation of "necessary" under s 251(c)(6) is im-
permissibly broad. At oral argument, counsel was asked 
whether, under the Collocation Order, a LEC would be 
required to afford collocation of a competitor's equipment that 
included unnecessary multi-purpose features, such as en-
hancements that might facilitate payroll or data collection 
features. In other words, must a LEC allow collocation of 
equipment that is not truly "necessary" for a competitor's 
"interconnection or access to unbundled network elements"? 
Counsel could offer no satisfactory answer to the question. 
Counsel seemed to recognize that to require collocation on 
such broad terms would not really square with the terms of 
s 251(c)(6); yet, the literal terms of the Collocation Order 
seem to embrace any and all equipment that is otherwise 
necessary without regard to whether such equipment unnec-
essarily "includes a switching functionality, provides en-
hanced service capabilities, or offers other functionalities." 
Collocation Order, 14 FCC Rcd at 4776 p 28 (emphasis add-
ed). The FCC's Collocation Order seeks to justify this broad 
rule by contending that "competitive telecommunications pro-
viders must be permitted to collocate integrated equipment 
that lowers costs and increases the services they can offer 
their customers." Id. at 4777-78 p 29. It was precisely this 
kind of rationale, based on presumed cost savings, that the 
Supreme Court flatly rejected in Iowa Utilities Board. See 
525 U.S. at 389-90. In short, the FCC's interpretation of 
"necessary" under s 251(c)(6) goes too far and thus "diverges 

from any realistic meaning of the statute." Massachusetts v. 
Department of Transp., 93 F.3d at 893.

 Because, in some significant respects, the FCC's current 
definition of "necessary" finds no support in the Act, we 
vacate the offending portions of the Collocation Order and 
remand the case to the agency for further consideration. We 
do not mean to vacate the Collocation Order to the extent 
that it merely requires LECs to provide collocation of com-
petitors' equipment that is directly related to and thus neces-
sary, required, or indispensable to "interconnection or access 
to unbundled network elements." Anything beyond this, 
however, demands a better explanation from the FCC, for the 
current rules under the Collocation Order make no sense in 
light of what the statute itself says. And the Commission 
must operate within the limits of "the ordinary and fair 
meaning of [the statute's] terms." Iowa Utilities Bd., 525 
U.S. at 390.

C. "Physical Collocation" and "Premises"

 Petitioners also challenge the FCC's interpretations of 
"physical collocation" and "premises" under s 251(c)(6). The 
Collocation Order requires LECs to make "cageless" colloca-
tion available to requesting competitors. Absent problems 
related to technical feasibility or specific security concerns, 
new competitors are entitled "to collocate in any unused space 
in the incumbent LEC's premises." Collocation Order, 14 
FCC Rcd at 4785 p 42. And to protect against bogus claims 
by LECs that they have run out of space, the Collocation 
Order provides that, when space is legitimately exhausted, 
LECs must "permit collocation in adjacent controlled envi-
ronmental vaults or similar structures to the extent technical-
ly feasible." Id. at 4786 p 44.

 Petitioners claim that the FCC lacks the authority to 
promulgate such sweeping rules in support of cageless collo-
cation, because "[a]s the language, structure, and history of 
s 251(c)(6) reflect, Congress understood 'physical collocation' 
to mean the installation of a competitor's equipment in an 
area that is physically separate from the incumbent's own 
facilities." Br. of Petitioners at 24. Petitioners also contend 

that Congress intended collocation to be limited to available 
space within a LEC's central office, and not to extend to 
anywhere on a LEC's property beyond the confines of the 
central office.

 Although petitioners raise some telling points, their argu-
ments go too far. Section 251(c)(6) merely provides that 
incumbents have a duty to provide "for physical collocation of 
equipment necessary for interconnection or access to unbun-
dled network elements at the premises of the local exchange 
carrier." 47 U.S.C. s 251(c)(6). Congress chose not to de-
fine either "premises" or "physical collocation," and, at least 
in this context, the meaning of these terms is far from self-
evident. Moreover, nothing in the statute can be read to 
require caged collocation, so the FCC surely was free to 
promulgate reasonable rules implementing physical colloca-
tion under a cageless regime.

 The FCC has satisfied its burden under step two of Chev-
ron in interpreting s 251(c)(6) as requiring cageless colloca-
tion. The Collocation Order points out that caged collocation 
results in the "inefficient use of the limited space in a LEC 
premises," Collocation Order, 14 FCC Rcd at 4784 p 42. A 
cageless regime, the Order notes, ensures that LECs do not 
place unreasonable minimum space requirements on collocat-
ing competitors; the rule thus has the effect of reducing the 
cost of collocation and reducing the likelihood of premature 
space exhaustion. See id. at 4785-86 p 43. We find that the 
agency's interpretation in support of cageless collocation is 
reasonable and consistent with the statutory purpose of pro-
moting competition, without raising the threat of unnecessary 
takings of LEC property. Indeed, on the record at hand, it is 
hardly surprising that the FCC opted to prohibit LECs from 
forcing competitors to build cages, particularly given the 
alternative means available to LECs to ensure the security of 
their premises.

 We also reject petitioners' claim that the FCC lacks author-
ity to require LECs to make available space beyond their 
central offices for the collocation of competitors' equipment. 
The Collocation Order simply requires "incumbent LECs, 

when space is legitimately exhausted in a particular LEC 
premises, to permit collocation in adjacent controlled environ-
mental vaults or similar structures to the extent technically 
feasible." Id. at 4786 p 44. The rule seeks to address the 
"issue of space exhaustion by ensuring that competitive carri-
ers can compete with the incumbent, even when there is no 
space inside the LEC's premises." Id. The rule clearly 
furthers the purpose underlying s 251(c)(6). The rule is also 
eminently reasonable: adjacent collocation is required only 
when space in the central offices is exhausted; adjacent 
collocation may occur only to the extent that it is technically 
feasible; adjacent collocation is subject to state regulations 
over zoning, design, and construction parameters; and adja-
cent collocation is subject to reasonable safety and mainte-
nance requirements. And petitioners can find no argument 
to show that this rule is impermissible under s 251(c)(6), for 
the simple reason that the disputed "adjacent" properties all 
are on the LECs' "premises," which is all that is required by 
the statute.

 In sum, the FCC's regulations forbidding LECs from re-
quiring competitors to "cage" their equipment and requiring 
LECs, under limited circumstances, to use adjacent property 
for the collocation of competitors' equipment are permissible 
and reasonable under step two of Chevron. This is not the 
end of the inquiry, however, regarding petitioners' challenge 
to the FCC's interpretation of "physical collocation" under 
s 251(c)(6).

 Petitioners argue that, even conceding the validity of cage-
less collocation and an interpretation of "premises" that in-
cludes both the central office and adjacent property, the 
Collocation Order still goes too far in giving competitors 
rights well beyond what is reasonably required by s 251(c)(6). 
In particular, petitioners point to paragraph 42 of the Colloca-
tion Order, which states, in part, that LECs

 must give competitors the option of collocating equip-
 ment in any unused space within the incumbent's prem-
 ises, to the extent technically feasible, and may not 
 
 require competitors to collocate in a room or isolated 
 space separate from the incumbent's own equipment.
 
Id. at 4785 p 42 (emphases added); see also Reply Br. at 16 
(complaining about paragraph 42). The Order acknowledges 
that a LEC "may take reasonable steps to protect its own 
equipment, such as enclosing the equipment in its own cage," 
id., but this gloss does not save the rest of the paragraph.

 The FCC offers no good reason to explain why a competi-
tor, as opposed to the LEC, should choose where to establish 
collocation on the LEC's property; nor is there any good 
explanation of why LECs are forbidden from requiring com-
petitors to use separate entrances to access their own equip-
ment; nor is there any reasonable justification for the rule 
prohibiting LECs from requiring competitors to use separate 
or isolated rooms or floors. It is one thing to say that LECs 
are forbidden from imposing unreasonable minimum space 
requirements on competitors; it is quite another thing, how-
ever, to say that competitors, over the objection of LEC 
property owners, are free to pick and choose preferred space 
on the LECs' premises, subject only to technical feasibility. 
There is nothing in s 251(c)(6) that endorses this approach. 
The statute requires only that LECs reasonably provide 
space for "physical collocation of equipment necessary for 
interconnection or access to unbundled network elements at 
the premises of the local exchange carrier," nothing more.

 The sweeping language in paragraph 42 of the Collocation 
Order appears to favor the LECs' competitors in ways that 
exceed what is "necessary" to achieve reasonable "physical 
collocation" and in ways that may result in unnecessary 
takings of LEC property. Once again we find that the FCC's 
interpretation of s 251(c)(6) goes too far and thus "diverges 
from any realistic meaning of the statute." Massachusetts v. 
Department of Transp., 93 F.3d at 893.

 The Collocation Order again suggests that there may be 
cost savings that will flow from the enunciated approach. See 
Collocation Order, 14 FCC Rcd at 4785 p 42. This is a weak 
claim. First, there is no explanation from the FCC as to why 
this would be so. It is not intuitive that all of what is 

required by paragraph 42 of the Collocation Order will sup-
port a decrease in the cost of collocation and an increase in 
the amount of available collocation space, as suggested by the 
FCC. See id. And merely saying it does not make it so. 
Second, and more importantly, as noted by the Court in Iowa 
Utilities Board, "delay and higher costs for new entrants ... 
[that may] impede entry by competing local providers and 
delay competition" cannot be used by the FCC to overcome 
statutory terms in the Telecommunications Act of 1996. 525 
U.S. at 389-90.

 We therefore vacate the Collocation Order insofar as it 
embraces the aforecited sweeping rules on physical colloca-
tion in paragraph 42. On remand, the FCC will have an 
opportunity to refine its regulatory requirements to tie the 
rules to the statutory standard, which only mandates physical 
collocation as "necessary for interconnection or access to 
unbundled network elements at the premises of the local 
exchange carrier." 47 U.S.C. s 251(c)(6). Even counsel for 
the Commission seemed unwilling to embrace an expansive 
view of paragraph 42: He suggested that LECs should be 
allowed to choose the collocation space; he also suggested 
that the LECs should be allowed to segregate collocation 
space from the rest of a LEC's property. If counsel's 
interpretation is correct, the FCC must make that clear. In 
any event, paragraph 42, as presently written, does not 
withstand scrutiny under step two of Chevron.

D. The FCC's Cost Allocation Rule

 The final issue before the court is petitioners' challenge to 
the FCC's cost allocation rule. The Collocation Order pro-
vides that LECs

 must allocate space preparation, security measures, and 
 other collocation charges on a pro-rated basis so the first 
 collocator in a particular incumbent premises will not be 
 responsible for the entire cost of site preparation.... 
 In order to ensure that the first entrant into an incum-
 bent's premises does not bear the entire cost of site 
 preparation, the incumbent must develop a system of 
 partitioning the cost by comparing, for example, the 
 
 amount of conditioned space actually occupied by the new 
 entrant with the overall space conditioning expenses.
 
Collocation Order, 14 FCC Rcd at 4789 p 51. State commis-
sions are charged to oversee this process "to ensure that 
incumbent LECs properly allocate site preparation costs 
among new entrants." Id. at 4790 p 51.

 Petitioners claim that the new rule is arbitrary and capri-
cious, because it forces LECs to bear the risk of unoccupied 
space. On this score, petitioners argue that "[i]t is bad 
enough that the incumbent must prepare space so that its 
competitors can take its property; it is beyond the pale that 
the Commission would make incumbents pay to do so." Br. 
of Petitioners at 32. This argument is specious.

 The approach adopted by the Commission is fully justified 
as a reasonable way to ensure that LECs do not impose 
prohibitive requirements on new competitors and thus kill 
competition before it ever gets started. As the Government 
pointed out in its brief in support of the FCC,

 new entrants asserted that incumbent LEC pricing prac-
 tices with respect to the preparation of collocation space 
 acted as an unreasonable barrier to competitive entry. 
 In particular, they assailed the practice of many [LECs] 
 of charging the first collocator up front for the entire 
 cost of preparing new collocation space (e.g., air condi-
 tioning and power generation upgrades), even if that 
 collocator was only going to use a small portion of the 
 available central office space.
 
See Br. of Respondents at 16. Petitioners do not seriously 
challenge this assertion.

 Petitioners nonetheless contend that the Commission's cost 
allocation rules fail to give them any reasonable mechanism to 
recover their costs for space that is not fully or permanently 
occupied. Petitioners' complaints are based, however, upon 
an apparent misreading of the Collocation Order. The Order 
does not define the contours of a recovery mechanism, but it 
clearly does not foreclose mechanisms for the recovery of 
LECs' prudently incurred costs. Rather, the Order simply 

notes that state commissions are charged with the responsi-
bility of "determin[ing] the proper pricing methodology," 
which undoubtedly may include recovery mechanisms for 
legitimate costs. Collocation Order, 14 FCC Rcd at 4789-90 
p 51; see also Br. for Respondents at 51 ("[T]he Order, fairly 
read, contemplates mechanisms for the recovery of [a LEC's] 
prudently incurred costs."). The FCC's cost allocation rule 
thus withstands judicial scrutiny, because it is neither arbi-
trary nor capricious.

 III. Conclusion

 Consistent with the foregoing opinion, we grant the peti-
tions for review in part and hereby vacate the challenged 
Collocation Order insofar as it embraces unduly broad defini-
tions of "necessary" and "physical collocation." The case will 
be remanded for further consideration by the FCC with 
respect to these two points. On all other points, the petition 
for review is denied.